FILED
COURT OF APPEALS
DIVISION II

2013 SEP -4 AM 10: 21

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| JOHN E. PETERSEN, JR. and ELLEN PETERSEN, husband and wife,<br><br>Appellants,<br><br>v.<br><br>BASELINE ENGINEERING, INC., a Washington corporation,<br><br>Respondent. | No. 43001-1-II<br><br><br><br><br><br>UNPUBLISHED OPINION |

HUNT, P.J. – John E. Petersen, Jr., and Ellen Petersen appeal the superior court's grant of summary judgment to Baseline Engineering, Inc. and dismissal of the Petersens' breach of contract claim. The Petersens argue that there are issues of fact about whether Baseline breached its contract to assist the Petersens in a short plat application process. We affirm. We also grant attorney fees and costs on appeal to Baseline.

## FACTS

### I. BACKGROUND

John E. Petersen, Jr. and his wife, Ellen Petersen, acquired an option to purchase a .91 acre Brown's Point property, which they intended to subdivide and to sell to another party. The option to purchase allowed the Petersens time to "check for environmental constraints or critical areas located on or adjacent to the property prior to purchase." Clerk's Papers (CP) at 95. The

Petersens contacted Baseline Engineering, Inc., a surveying, engineering, and land development services firm.

A. Baseline Short Plat Application Contract

On October 18, 2006, Baseline sent John Petersen a letter stating its interest in "assist[ing the Petersens] in short platting [the] property in Brown's Point." CP at 41. Baseline advised Petersen that it had discussed the project with Pierce County staff "for the purpose of determining whether additional lots could be obtained" and had concluded a two-lot short plat would be "the most feasible and economical" approach. CP at 41. Baseline offered the following services: (1) a "boundary and topographic survey"; (2) preparation of a "short plat drawing and other standard application materials for submittal to Pierce County"; and (3) "consult[ing]" with Petersen "and/or representative, [or] other subconsultants (such as geotechnical engineer, traffic engineer, wetland biologist, etc.), and local agency staff (City, County, [Washington State Department of Transportation], Fire Marshal, etc.)." CP at 41, 42 (capitalization omitted).

The section of the letter addressing preparation of the short plat application stated:

SHORT PLAT APPLICATION

Prepare short plat drawing and other standard application materials for submittal to Pierce County. *This task does not include Sensitive Areas Analysis*, Traffic Impact Analysis, Geotechnical Reports, *or other specialized technical studies as may be required by Pierce County during review of the application.*

CP at 42 (emphasis added). The letter further explained:

The above described scope to make application to Pierce County for a short plat is generally predictable and can be defined. *However, until Pierce County reviews and comments on the application, it is not possible to determine with any degree of certainty actions which will be required to obtain complete short plat approval*

2

*from the County*. After Pierce County review comments are received, we will be able to more precisely determine "additional scope and fees" i.e. engineering design and final plat documents.

CP at 42 (emphasis added). The letter also advised that Petersen would be "responsible for all City, State, County or Local fees and taxes." CP at 42. Petersen signed the letter and accepted Baseline's proposal on November 20.

### B. Sewall Wetland and Stream Analysis

Meanwhile, Petersen hired Sewall Wetland Consulting, Inc. to conduct a "[w]etland and [s]tream [a]nalysis" of the property; Petersen separately hired an engineering geologist to provide a soils report. CP at 96. In a November 2, 2006 letter, wetlands ecologist Ed Sewall advised Petersen that (1) there were conditions suggesting a wetland area, likely caused by fill having been placed on the property; and (2) it was his "professional opinion that the site[']s soil and vegetation conditions are a result of past disturbance and appear to not be a result of wetland conditions." CP at 48. Sewall also cautioned Petersen that "only early growing season monitoring would confirm if the area is wet or not." CP at 48.

### C. Two-Lot Short Plat Application and County Response; PSA[1] To Sell Property to Buchanan

Baseline completed the boundary and topographic survey in December, but it could not proceed further with the short plat application until Petersen provided Baseline with a landscape plan and title report. Petersen provided Baseline with the landscape plan and title report in July 2007, after exercising the option to purchase the Brown's Point property on June 25, 2007.

---

[1] Purchase and Sale Agreement.

3

Nevertheless, Baseline planner Kevin Foley declined to perform the civil engineering site development work at this stage because the county had not yet reviewed the initial short plat application. Consistent with the contract,[2] Foley told Petersen that the engineering site development work should wait until they received the county's initial review of the short plat application because the county's final decision on certain issues, such as lot density and location of any sensitive areas, would affect that engineering site work and could require major design changes. Foley also told Petersen that he did not think Sewall's wetland and stream analysis would meet county requirements.

Despite Foley's advice, Petersen hired engineer Brant Schweikl to do the site development permit work in mid-July. On August 28, the Petersens entered into a PSA to sell the property to Herman Buchanan for $485,000, with a September 29 closing date. According to Petersen, although the PSA did not specifically state any conditions or contingencies other than a financing contingency, "preliminary plat approval" was a requirement for the sale. CP at 108.

Also in August, Baseline submitted to the county a two-lot short plat application, which included, at Petersen's request, the Sewall wetland and stream analysis about which Foley had expressed doubts to Petersen. Petersen justified inclusion of Sewall's analysis, stating:

> I wanted my expert[']s "sensitive area analysis" [i]n the hands of the county environmental biologist. My feeling was; *if the county wants something else they would tell us.* If they felt we had a potential environmental issue *they would tell us if we needed to provide any additional information.*

---

[2] The contract provided that Baseline would provide Petersen information about "'additional scope and fees,'" including engineering design, only *after* the county reviewed the initial short plat application. CP at 42.

CP at 98-99 (emphasis added).

On August 28, county senior planner Dierdre Wilson sent Baseline a letter stating that (1) the two-lot short plat did not meet the county's density requirements unless there were "environmentally constrained lands" on the parcel reducing the area subject to development; and (2) "[r]esearch in our GIS system does not result in any environmentally constrained lands on this parcel that may reduce the developable area for net developable acreage calculations." CP at 50. The county also sent a copy of this letter to the Petersens.

On September 10, however, county environmental biologist Teresa Lewis sent the Petersens a letter advising them that (1) the county had reviewed the application materials and "determined the proposed project requires Wetland Review";[3] (2) the project was subject to section 18E.30.030(A)(4) of the county's critical areas development regulations (CADR),[4] which provides:

> "When the Department's maps, sources, or field investigation indicate that a potential wetland is located within 315 feet of the project area [. . .] the Department shall require a site evaluation (field investigation) to determine whether or not a regulated wetland is present and if so, its relative location in relation to the proposed project area or site. The findings of the site evaluation shall be documented as outline in subsection 18E 30.030 B.,[5] C.,[6] D.,[7] or E.[8]"

[3] CP at 54.

[4] Title 18E PIERCE COUNTY CODE.

[5] CADR 18E 30.030(B) provides: "General wetland review shall include the submittal of a wetland verification report or a wetland analysis report, together with a wetland application and fee." CP at 253. The regulation also sets out the contents of wetland verification and analysis reports and prescribes what supporting documents should accompany each type of report.

[6] CADR 18E 30.030(C) describes two alternative single-family-dwelling review processes.

CP at 54 (quoting CADR 18.E.30.030(A)(4)) (emphasis omitted);[9] (3) the Petersens needed to submit a wetland review fee and various documents related to this review; (4) if the county located a wetland on the property, the Petersens would also have to submit a wetland analysis report and an additional fee; and (5) any wetland specialist submitting a wetland analysis must be selected from the county's list of qualified wetland specialists, unless the person conducting the review submitted his or her qualifications to the county for review and possible approval.[10] Lewis also sent a copy of this letter to Baseline.

Petersen claimed that he "was unaware of [Lewis's] letter for several weeks" because he had been busy working and not reviewing his mail. CP at 102. When he finally read the letter, he initially thought Baseline had not submitted the Sewall report with the plat application. CP at 104, 130. Angered, Petersen contacted Terrell Ferguson, Baseline's owner and a professional surveyor.

Petersen met with Ferguson and Schweikl on October 18. According to Petersen, Ferguson was not sure if the Sewall report had been submitted to the county with the initial two-lot short plat application, but he told Petersen that the county also "needed a check for the submittal fee ($567)." CP at 105. Relying on Wilson's letter and Sewall's report, Ferguson

---

[7] CADR 18E 30.030(D) describes the agricultural activity wetland review process.

[8] CADR 18E 30.030(E) describes the forest practice wetland review process.

[9] *See also* CP at 253.

[10] The record does not show whether Sewall was on the county's list of qualified wetland specialists or whether he submitted his qualifications to the county for approval.

recommended proceeding with a three-lot short plat because he did not think Wilson's August 2007 letter allowed any other option. Ferguson did not, however, rely on Lewis's September 2007 letter, which required a wetland review and which Baseline had received. Ferguson also mistakenly thought that the county had not yet seen Sewall's report. Petersen agreed to seek a three-lot short plat.

D. Three-Lot Short Plat Application and County Response; Buchanan Withdraws PSA

Until late January 2008, Baseline worked on various issues related to the three-lot short plat, including a road variance required to meet county density requirements. According to Petersen, the county did not allow them to proceed with the three-lot short plat application until the road variance issue was resolved On April 24, Baseline submitted to the county the three-lot short plat "design," again including Sewall's wetland and stream analysis. CP at 107.

According to Petersen, Buchanan "backed out of the [PSA] in February 2008 prior to [the completion of] the 3-lot design." CP at 107. Nevertheless, when the new three-lot plan was submitted to the county, Petersen still "felt pretty good about the whole thing[, because he] had an investor that was interested in financing [his] development of 3-lots and [he] had several other interested buyers." CP at 107. In May, the county sent another letter,[11] which according to Petersen, was "almost the same letter as the September 10, 2007 letter from Teresa Lewis. This time we paid the fee along with the application." CP at 107.

Petersen set up a meeting with Lewis and Sewall to review the property. Following a site visit, review of old aerial photographs, and another meeting with Petersen, Lewis concluded that

---

[11] The record does not show whether Lewis sent this letter to Baseline or to Petersen.

the property contained a "N2 natural stream" and a category 4 wetland. CP at 108. Petersen

chose not to appeal Lewis's decision because it would have taken three to four months to set a

hearing and there was no guarantee the appeal would be successful.

E. Abandonment of Three-Lot and Return to Two-Lot Short Plat Application

Because Lewis had determined that there were critical areas on the property, Petersen

abandoned the three-lot short plat and returned to the two-lot short plat approach. By August

2008, the county gave "preliminary plat approval" for the two-lot plan. CP at 108.

In late 2008 and 2009, the property market declined significantly. Eventually the

Petersens' mortgage holder foreclosed on the property.

II. PROCEDURE

On October 28, 2010, the Petersens sued Baseline for breach of contract. They asserted

that Baseline had (1) failed to review and to respond to county correspondence, (2) failed to seek

input or clarification from the county, (3) provided them (the Petersens) with incorrect advice

during consultations, and (4) prepared and filed a short plat application based on "the erroneous

advice that was rejected by the county." CP at 25. Baseline moved for summary judgment,

arguing that it had performed the contracted services and met the required standards and that any

losses the Petersens suffered were caused by market changes, not breach of contract. The

superior court granted Baseline's motion for summary judgment, dismissed the Petersens' breach

of contract action, and awarded Baseline attorney fees and costs.

The Petersens moved for reconsideration, arguing that there were remaining questions of

fact as to (1) the scope of Baseline's duties under the contract, specifically, whether the contract

required Baseline to assist the Petersens in obtaining short plat approval by "'consult[ing] with

the county regarding whether there were environmental constrained lands, including wetlands, stream, erosion hazard areas, on the property'"; and (2) whether Baseline breached the contract by submitting an incomplete plat application to the county. CP at 350. Baseline responded that the contract's plain language expressly excluded preparing or submitting any sensitive areas materials. Apparently rejecting the motion for reconsideration, the superior court entered judgment against the Petersens. The Petersens appeal.

ANALYSIS

The Petersens argue that there are material facts about whether Baseline breached the contract and, therefore, the superior court erred in dismissing their action on summary judgment.[12] The Petersens' core argument is that if Baseline had

> included the fee along with the application, or read or responded to the September 10, 20[07] letter from Teresa Lewis, the county would have received the site investigation fee months earlier as was done properly at [the] time of [the] three lot submittal, and subsequently identified the wetlands on the site much sooner. With knowledge of the existing wetlands in hand, Baseline would never have given the disastrous advice to Petersen to apply for three lots.

Br. of Appellant at 18. We disagree.

I. STANDARD OF REVIEW

We review summary judgment orders de novo, performing the same inquiry as the superior court. *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 860, 93 P.3d 108 (2004).

---

[12] The Petersens also assert that there are issues of fact as to whether Baseline "breached the applicable standard of care." Br. of Appellant at 3. A breach of a legal standard of care is a tort claim, not a contract claim. *See Owens v. Harrison*, 120 Wn. App. 909, 915, 86 P.3d 1266 (2004) (citing *G.W. Constr. Corp. v. Prof'l Serv. Indus., Inc.*, 70 Wn. App. 360, 364, 853 P.2d 484 (1993), *review denied*, 123 Wn.2d 1002 (1994)). Because the Petersen's action below was based on a contract claim (and the Petersens withdrew their negligence claim), whether Baseline breached any duty of care is not an issue before us on appeal.

The superior court properly grants summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Hisle*, 151 Wn.2d at 861 (citing CR 56(c)). The burden is on the moving party to demonstrate that summary judgment is proper. *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990). Summary judgment is appropriate only if, from all the evidence, reasonable persons could reach but one conclusion. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982), *superseded by statute on other grounds as stated in Faust v. Albertson*, 167 Wn.2d 531, 538, 222 P.3d 1208 (2009).

## II. CONTRACT'S SCOPE; NO BREACH BY BASELINE

We first address whether the contract required Baseline (1) to submit the wetland review fee with the initial two-lot short plat application, or (2) to respond to Lewis's September 10, 2007 letter. The plain language of the contract shows that it did not require Baseline to perform these functions; accordingly, we hold that Baseline did not breach its contract with the Petersens.

### A. Contract Interpretation

> Contract interpretation is normally a question of fact for the fact-finder. *See, e.g., Berg v. Hudesman*, 115 Wn.2d 657, 663, 801 P.2d 222 (1990) (distinguishing contract interpretation, a question of fact, from contract construction, a question of law); *Hansen v. Transworld Wireless TV-Spokane, Inc.*, 111 Wn. App. 361, 376, 44 P.3d 929 (2002) ("Whether there was mutual assent normally is a question of fact for the jury.")[, *review denied*, 148 Wn.2d 1004 (2003)]; *In re Estate of Richardson*, 11 Wn. App. 758, 761, 525 P.2d 816 (1974) ("The existence of a contractual intention is ordinarily a fact question to be resolved by the trier of the facts.")[, *review denied*, 84 Wn.2d 1013 (1974)]. But summary judgment on an issue of contract interpretation is proper where "the parties' written contract, viewed in light of the parties' other objective manifestations, has only one reasonable meaning." *Hall v. Custom Craft Fixtures, Inc.*, 87 Wn. App. 1, 9, 937 P.2d 1143 (1997).

*Spradlin Rock Products, Inc. v. Public Utility Dist. No. 1 of Grays Harbor County*, 164 Wn. App. 641, 654-55, 266 P.3d 229 (2011). "A contract is ambiguous if its terms are uncertain or they are subject to more than one meaning." *Dice v. City of Montesano*, 131 Wn. App. 675, 684, 128 P.3d 1253, *review denied*, 158 Wn.2d 1017 (2006). But contract terms are not ambiguous simply because parties suggest opposing meanings. *Dice*, 131 Wn. App. at 684. Such is the case here.

### B. Contract Not Ambiguous; No Breach of Contract

As we earlier noted, the Petersens' contract with Baseline required Baseline to prepare only a "short plat drawing and other standard application materials for submittal to Pierce County."[13] The contract expressly provided that this standard short plat application "task [*did*] *not include* Sensitive Areas Analysis, Traffic Impact Analysis, Geotechnical Reports, or other specialized technical studies as may be required by Pierce County during review of the application." CP at 42 (emphasis added). The contract also expressly provided that Petersen was responsible to pay any county fees.

The contract's language was unambiguous: It put the responsibility for any county-required "[s]ensitive [a]reas [a]nalysis" on Petersen, not Baseline, and it made Petersen responsible for any fees. CP at 42. Thus, Petersen's argument—that Baseline's failure to address the wetland issue (by responding to Lewis's September 10, 2007 letter) and/or failure to pay fees related to the wetland issue delayed the project (resulting in decrease of the property's value) lacks support in the contract and in the record.

---

[13] CP at 42.

Nevertheless, the Petersens contend that they presented evidence creating a question of fact about whether the county would have preliminarily approved the two-lot short plat in three months, rather than the year it actually took, if Baseline had responded to the county's letters (including Lewis's September 10, 2007 letter), or if the planner who took over for Foley had visited the site in person. According to the Petersens, this delay rendered them unable to resell the property until after the market prices fell. Again, as discussed above, it was not Baseline's responsibility to resolve any wetland issues; on the contrary, under the contract's plain language, hiring a county-approved wetlands expert to resolve any wetland issues with the county was Petersen's responsibility.

Furthermore, it was not Baseline's choice to proceed with a three-lot short plat application that delayed discovery of critical areas on the property. Despite knowing of potential critical areas on the property by October 2007 (when Petersen read Lewis's September 10, 2007 letter), Petersen took no steps to resolve this critical areas issue until after he received a second, nearly identical notification in May 2008. If Petersen had acted promptly to resolve the wetland issue after receiving Lewis's September 10, 2007 letter, the two-lot short plat could have been completed much earlier. It was not Baseline's responsibility to resolve the critical areas issue; rather, it was Petersen's responsibility. And Petersen failed to resolve this issue until after Baseline submitted the three-lot short plat application, at Petersen's request; thus, any delay in discovering the existence of the critical areas and the subsequent delay in the county's approval was Petersen's doing, not Baseline's.

The Petersens next argue that Baseline breached the contract by filing an incomplete short plat application that did not include a sensitive area analysis and related fee. Again, these

two responsibilities were clearly outside the scope of Baseline's contractual duties: The contract expressly provided not only that Baseline was not responsible for any sensitive area analysis, but also that it was not possible to determine whether the county would require any additional documentation until after the county reviewed the short plat application. Moreover, nothing the Petersens presented in opposition to Baseline's summary judgment motion established that the county required applicants to submit a sensitive area analysis with an initial short plat application. And because the contract required Petersen to pay the short plat application fee, it was Petersen, if anyone, who breached the fee payment provision of the contract, not Baseline.

The Petersens also assert that (1) Baseline further breached the contract by failing to consult with the county about various issues, including wetlands; and (2) "Mr. Petersen hired Baseline to do a short plat of his property. At no time was he advised, instructed, requested or otherwise asked by Baseline to do anything with regards to corresponding with the [c]ounty in regards to the short plat." Br. of Appellant at 20. This argument lacks support in the record, which shows that Baseline met with the county on numerous issues, such as road variances, in developing the plat. Furthermore, the contract clearly stated that Baseline would "[p]repare short plat drawing and other standard application materials," emphasized that this task did *not* include any sensitive areas analysis or other specialized review that the county might require during its review of the application, and provided that any fees were Petersen's responsibility. CP at 42.

This plain contractual language (1) establishes as a matter of law that Baseline was not required to address the property's potential wetland issue, and (2) put Petersen on notice that he (or the specialists he hired for this purpose) was responsible for the wetlands aspect of the short plat application. We hold, therefore, that there was no question of fact about whether Baseline

13

breached its contract and, thus, the superior court did not err in granting summary judgment to Baseline on the Petersens' claim.

### III. NO DELAY OR DAMAGES CAUSATION BY BASELINE

The Petersens also raise several arguments that do not relate directly to the wetland issue, but rather claim damages resulting from the delay in the short plat application process, which delay they attribute to Baseline. These additional arguments fail because the Petersens fail to establish a question of fact about proximate cause of the alleged delay and resultant damages. *C 1031 Properties, Inc. v. First American Title Ins. Co.*, ___ Wn. App. ___. 301 P.3d 500, 503 (2013) (contract claim requires showing that breach proximately caused plaintiff's damage).

The Petersens first argue that Baseline failed to respond when the county returned a short plat drawing with markups. Taking the facts in the light most favorable to the non-moving party for summary judgment purposes, we assume, without deciding, that Baseline failed as alleged. Such failure, however, is irrelevant because the Petersens presented no evidence showing that such failure caused the delay or was related to any potential damages.

Second, the Petersens assert that Baseline erroneously advised them to increase the density of the proposed plat before knowing what the county had to say about any potential wetlands. Again, the Petersens fail to show a question of fact about whether any such erroneous advice caused any damages. Moreover, the contract provided that Petersen, not Baseline, was responsible for addressing the wetland issue; but Petersen did not address potential wetlands issue with the property until May 2008 at the earliest, despite knowing of this requirement seven months earlier when he read Lewis's September 10, 2007 letter in October 2007. If Petersen had addressed the wetlands issue when he first became aware of it in October 2007, it could have

14

been resolved after his October meeting with Ferguson and not long after Baseline began investigating the three-lot short plat option.

Furthermore, a significant portion of the damages the Petersens allege relate to the engineering costs they owe Schweikl. But Petersen admitted that he had acted *against* Baseline's advice when he chose to hire Schweikl and to proceed with the engineering portion of the project well before the county's preliminary review of the short plat application. The record shows that, had Petersen waited to hire Schweikl until after the county reviewed the application, as Foley advised, and had Petersen resolved the wetland issue before hiring Schweikl, Petersen would not have incurred Schweikl's extra engineering costs.[14] The Petersens fail to establish a question of fact about whether Baseline's actions caused any of these extra engineering costs.

Because the Petersens fail to establish any questions of material fact, we hold that the trial court did not err in granting Baseline's summary judgment motion and dismissing the Petersens' contract action.

---

[14] *See* Schewikl's deposition testimony that "most if not all of those difficulties that [he, Schewikl] encountered doing the engineering would have been avoided if [Petersen] had waited until he got his preliminary approval before proceeding with the development permit." CP at 310-11.

No. 43001-1-II

## IV. ATTORNEY FEES AND COSTS

Baseline requests attorney fees and costs under the contract and RAP 18.1(a). The contract provides for an award of attorney fees and costs incurred in litigating contractual issues.[15] Accordingly, we grant Baseline's request for attorney fees and costs on appeal upon compliance with RAP 18.1(d).

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Hunt, P.J.

We concur:

_____
Penoyar, J.

_____
Bjorgen, J.

---

[15] The contract contains the following clause: "In case of suit, or if this account is placed in attorney's hand for collection, CLIENT shall pay all costs of the suit and of collection, including any and all attorney's fees actually incurred by the Engineer to the particular attorneys involved at such attorneys' then normal hourly rate." CP at 322.